# IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF NORTH CAROLINA STATESVILLE DIVISION

### No. 5:02-CV-111-V

| | | |
|---|---|---|
| **DIRECTV, Inc.,** | ) | **DIRECTV'S MEMORANDUM IN** |
| | ) | **SUPPORT OF ITS MOTION TO** |
| **Plaintiff,** | ) | **DISMISS COUNTERCLAIM OF** |
| | ) | **DEFENDANT DAVIDSON** |
| **v.** | ) | |
| | ) | Fed. R. Civ. P. 12(b)(6) |
| **BERNARD DAVIDSON,** | ) | |
| | ) | |
| **Defendant.** | ) | |

Plaintiff DIRECTV, Inc., ("DIRECTV"), respectfully submits this memorandum in support of its motion, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss the counterclaim of Defendant Bernard Davidson. The counterclaim fails to state any claim upon which relief may be granted.

## I. STATEMENT OF FACTS

DIRECTV is a California-based company in the business of distributing satellite television broadcasts throughout the United States. Complaint ¶ 2. Using encryption technology, the programming is scrambled by DIRECTV, and then transmitted to subscribers from satellites orbiting the Earth. Once broadcast, the subscribers receive the signals through satellite dishes. *See id.* ¶¶ 2, 3. The dishes are attached to receivers designed to unscramble the signals for those programs paid for by the subscriber. *Id.* ¶ 3.

A number of individuals have engaged in the manufacture and sale of illegal devices used to circumvent DIRECTV's encryption technology and security measures. On December 11, 2001, DIRECTV executed Writs of Seizure issued by the United States District Court for the Central District of California, upon the business facilities of USA CardCleaners, a company

engaged in the sale of illegal equipment designed to steal DIRECTV's programming. During and subsequent to the raids, DIRECTV came into possession of a substantial body of sales records, shipping records, email communications, and credit card receipts listing sales of the illegal equipment to individuals, including many subscribers to DIRECTV programming. *See id* ¶¶ 8, 9. According to USA CardCleaners' sales records, Mr. Davidson purchased illegal equipment designed for the theft of DIRECTV's satellite television programming. *Id.* ¶ 17.

DIRECTV filed a complaint against Mr. Davidson, in this Court on September 16, 2002, alleging violations of federal and state law with respect to the purchase, possession, and use of illegal equipment designed for the purpose of stealing DIRECTV's satellite television programming. Mr. Davidson had failed to answer or otherwise respond to the complaint when DIRECTV moved for entry of default and default judgment. Subsequent to this motion, Mr. Davidson asked the Court for an extension of time to answer. The Court denied the motion for entry of default and gave Mr. Davidson a 30-day extension. Mr. Davidson did not answer during that 30-day period. Mr. Davidson only submitted his answer, along with a counterclaim, on March 11, 2003, shortly after Mr. Davidson's counsel was advised that DIRECTV would file a second motion for entry of default if Mr. Davidson did not answer. DIRECTV now moves to dismiss the counterclaim.

## II. ARGUMENT

Dismissal of a claim pursuant to a Rule 12(b)(6) motion is proper where, after assuming all factual allegations to be true, the pleading fails to set out sufficient facts for a court to find that each element of a cause of action is present. *See, e.g., Commodity Futures Trading Comm'n v. IBS, Inc.*, 113 F. Supp. 2d 830, 842 (W.D.N.C. 2000), *aff'd*, 276 F.3d 187 (4th Cir. 2002). The

same standard applies for motions to dismiss counterclaims under Rule 12(b)(6). *See, e.g.,* *Coliseum Cartage Co. v. Carlen Distr. Sys., Inc.*, 732 F. Supp. 1340, 1342 (M.D.N.C. 1989).

Facing counterclaims similar to Mr. Davidson's, two judges in the Eastern District of North Carolina recently granted DIRECTV's motions to dismiss. *See DIRECTV, Inc. v. Breedlove*, No. 5:02-CV-679-BR3 (E.D.N.C. Mar. 16, 2003) (attached); *DIRECTV, Inc. v. Callahan*, No. 5:02-CV-741-BO(3) (E.D.N.C. Mar. 29, 2003) (attached). The defendant in *Breedlove* claimed that DIRECTV's demand letters and subsequent litigation constituted unfair debt collection practices and unfair trade practices under North Carolina law. Judge Britt dismissed these counterclaims, holding that the acts of the defendant constituted theft, and therefore that she was not a "consumer" within the scope of North Carolina law. *See id.* at 7. Accordingly, neither of her counterclaims stated causes of action as a matter of law. *See id.* at 8-9.[1]

The defendant in *Callahan* made similar counterclaims. Judge Boyle, like Judge Britt, found that DIRECTV's alleged damages did not constitute a debt, and that Callahan therefore failed to state a claim for unfair debt collection practices. Judge Boyle further found that Callahan had not otherwise stated a claim for unfair and deceptive trade practices under Section 75-1.1 of the North Carolina General Statutes. *Id.* at 5.

Mr. Davidson's counterclaim is essentially the same as those dismissed in *Breedlove* and *Callahan*. He also alleges that DIRECTV has engaged in unfair and deceptive trade practices, as defined by Section 75-1.1 of the North Carolina General Statutes, in sending demand letters to Mr. Davidson and subsequently initiating this lawsuit against him. *See* Counterclaim ¶ 5. Mr.

---

[1] Because Judge Britt held that the defendant had not stated a claim for unfair trade practices, he did not address the *Noerr-Pennington* issue raised by DIRECTV in its motion to dismiss and supporting memorandum. *Breedlove* at 4. The *Callahan* opinion is silent on the *Noerr-Pennington* issue.

3

Davidson does not specifically allege a violation of the unfair debt collection practices statutes, unlike the defendant in *Breedlove*. Nevertheless, Judge Britt's reasoning is instructive, as he found that the alleged conduct constituted theft. Efforts to rectify a theft should not be considered unfair trade practices. Furthermore, Judge Boyle did not restrict his analysis to the debt collection issue, and found that the defendant in *Callahan* failed to state a claim for any type of unfair trade practice or act.

Just as the defendants in the two Eastern District of North Carolina cases discussed above failed to state valid counterclaims, Mr. Davidson's counterclaim fails to state a claim. His counterclaim fails as a matter of law for two reasons. First, the counterclaim fails to establish the essential elements of a claim for unfair or deceptive trade practices under Section 75-1.1 of the North Carolina General Statutes. Second, the claim is barred by the First Amendment right to petition the government, including the courts, for redress. This fundamental right prohibits liability for the filing of a lawsuit and the preliminary steps leading up to the lawsuit, which is exactly the conduct alleged by Mr. Davidson to be an "unfair and deceptive trade practice." Accordingly, Mr. Davidson's counterclaim is subject to dismissal as a matter of law.

A.      **Defendant's Counterclaim Fails to State a Claim for Unfair or Deceptive Trade Practices.**

Mr. Davidson's counterclaim fails to satisfy the minimum requirements for pleading a claim for unfair or deceptive trade practices under Section 75-1.1 of the North Carolina General Statutes. In order to establish a prima facie claim for unfair trade practices, a party must show: (1) defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff. *Dalton v. Camp*, 353 N.C. 647, 656, 548 S.E.2d 704, 711 (2001). The mere allegation that an act was unfair or deceptive, absent more, does not meet the pleading requirement. "Some type of

4

egregious or aggravating circumstances must be alleged and proved before the [unfair trade practices] statute's provisions may be applied." *Allied Distribs., Inc. v. Latrobe Brewing Co.*, 847 F. Supp. 376, 379 (E.D.N.C. 1993).

The counterclaim lacks factual allegations to meet the pleading requirements for Section 75-1.1. Specifically, Mr. Davidson has failed to allege facts demonstrating that DIRECTV committed an unfair or deceptive act or practice. The counterclaim alleges that the fact that DIRECTV sent out demand letters to Mr. Davidson regarding his purchase of pirate devices, and then initiated this lawsuit when the company's efforts to effect a settlement failed are somehow unfair acts or practices. *See* Counterclaim ¶ 5. The only stated bases for this conclusion are: (1) DIRECTV has resources and the financial ability to handle litigation, *see* Counterclaim ¶ 6; and (2) DIRECTV did not first obtain sufficient evidence to prove each of the allegations stated in the complaint. *See id.* Neither of these allegations supports a finding that the demand letters and litigation are unfair trade practices. A trade practice is "unfair" when it offends public policy, and when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers. *Miller v. Nationwide Mut. Ins. Co.*, 112 N.C. App. 295, 301, 435 S.E.2d 537, 542 (1993). A privately-delivered demand letter by a business, informing the recipient that the business intends to pursue its rights, does not constitute an unfair trade practice. *See Walker v. Branch Banking & Trust Co.*, 133 N.C. App. 580, 584, 515 S.E.2d 727, 730 (1999). DIRECTV's purported "massive corporate resources" were neither communicated to Mr. Davidson nor are they relevant where, as here, DIRECTV simply demanded that Mr. Davidson make the company whole for his misuse of the illegal devices he purchased, and informed him that it would file suit if he did not agree to the demanded settlement terms. Judge Boyle

5

reviewed a similar demand letter and found that nothing about it violated Chapter 75 of the North Carolina General Statutes. *Callahan,* No. 5:02-CV-741-BO(3), at 5.

Moreover, Mr. Davidson is not a "consumer" within the intended scope of the unfair trade practices act, given that he is alleged to have purchased devices from a third-party distributor for the purpose of stealing DIRECTV's satellite television programming. *See Breedlove,* No. 5:02-CV-679-BR3, at 7 ("An alleged thief is simply not a consumer, and damages for allegedly illegal conduct cannot be considered debt within the meaning of the statute."); *see also Serpico v. Menard, Inc.,* 927 F. Supp. 276, 282 (N.D. Ill. 1996) (store's alleged practice of sending demand letters threatening to sue shoplifters not violative of Illinois consumer fraud and deceptive practices act because shoplifter not "consumer" under Illinois statute). Because DIRECTV's acts are not unfair as a matter of law, the counterclaim fails.

The counterclaim also offers no factual support for the element of proximate causation. "Recovery according to Chapter 75 is limited to those situations when a plaintiff can show that plaintiff detrimentally relied upon a statement or misrepresentation and he or she 'suffered actual injury as a proximate result of defendant's deceptive statement or misrepresentation.'" *Forbes v. Par Ten Group, Inc.,* 99 N.C. App. 587, 601, 394 S.E.2d 643, 651 (1990) (quoting *Pearce v. Am. Defender Life Ins. Co.,* 316 N.C. 461, 471, 343 S.E.2d 174, 180 (1986)); *see also Hageman v. Twin City Chrysler Plymouth, Inc.,* 681 F. Supp. 303, 309 (M.D.N.C. 1988). In his counterclaim, Mr. Davidson alleges that he received demand letters threatening litigation. In fact, Mr. Davidson made no payments to DIRECTV, and DIRECTV initiated litigation. Thus, Mr. Davidson has not taken any act in detrimental reliance upon DIRECTV's actions. Accordingly, Mr. Davidson's counterclaim fails as a matter of law on this element as well.

**B.** **Defendant's Counterclaim Is Barred Under the First Amendment Right to Petition and *Noerr-Pennington* Doctrine.**

**1.** **Background of *Noerr-Pennington* Doctrine**

The First Amendment provides, in relevant part, that "Congress shall make no law …

abridging … the right of the people … to petition the Government for a redress of grievances."

U.S. Const. Amend. I, § 6. The Supreme Court has recognized this right to petition as one of

"the most precious of the liberties safeguarded by the Bill of Rights," *Mine Workers v. Illinois*

*Bar Assn.*, 389 U.S. 217, 222 (1967), and have explained that the right is implied by "[t]he very

idea of a government, republican in form." *United States v. Cruikshank*, 92 U.S. 542, 552

(1876). This right to petition has been recognized to include the right of access to the courts for

the purpose of litigation. *See, e.g., BE & K Constr. Co. v. N.L.R.B.*, 536 U.S. 516, ___, 122 S.

Ct. 2390, 2396 (2002) (citing *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S.

508, 510-11 (1972)).

An extension of the right to petition for redress before the courts is the *Noerr-Pennington*

doctrine.[2] That doctrine immunizes litigation and other petitioning conduct from liability. *See,*

*e.g., Professional Real Estate Investors, Inc. v. Columbia Pictures Indus.*, 508 U.S. 49, 51 (1993)

(hereafter "*PREI*"). Although the *Noerr-Pennington* doctrine first arose in antitrust cases, the

courts have applied the petitioning-based immunity from liability outside the antitrust context as

well. *See, e.g., NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 913-15, 102 S. Ct. 3409,

3425-26, 73 L. Ed. 2d 1215, 1236-38 (1982) (holding First Amendment immunized non-violent

petitioning conduct, and applied *Noerr* in considering whether intent or purpose of boycott was

---

[2]     The name of the doctrine comes from two United States Supreme Court decisions:
*Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S. Ct.
523, 5 L. Ed. 2d 464 (1961), and *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S. Ct.
1585, 14 L. Ed. 2d 626 (1965).

7

relevant); *Brownsville Golden Age Nursing Home, Inc. v. Wells*, 839 F.2d 155, 160 (3d Cir. 1988) (*Noerr-Pennington* doctrine immunized defendants from tort liability for petitioning government to shut down nursing home); *Havoco of America, Ltd. v. Hollobow*, 702 F.2d 643, 649-50 (7th Cir. 1983) (applying *Noerr-Pennington* doctrine in context of complaints registered with Securities and Exchange Commission, and affirming summary judgment entered against liability claims based on those complaints); *Eurotech, Inc. v. Cosmos European Travels Aktiengesellschaft*, 189 F. Supp. 2d 385, 392-94 (E.D. Va. 2002) (applying *Noerr-Pennington* doctrine in context of international Internet trademark infringement arbitration).

In *PREI*, the Supreme Court held that the *Noerr-Pennington* doctrine immunizes the filing of lawsuits, regardless of the purposes of the lawsuits, so long as the litigation is not a "sham." *See PREI*, 508 U.S. at 51, 113 S. Ct. at 1923, 123 L. Ed. 2d at 618. To be a "sham," a lawsuit must be objectively baseless. *See id.* at 60, 113 S. Ct. at 1928, 123 L. Ed. 2d at 624. A lawsuit is objectively baseless only if "no reasonable litigant could realistically expect success on the merits." *See id.* If an objective party can conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under the *Noerr-Pennington* doctrine. *See Baltimore Scrap Corp. v. David J. Joseph Co.*, 237 F.3d 394, 399 (4th Cir.) (quoting *PREI*, 508 U.S. at 60, 113 S. Ct. at 1928, 123 L. Ed. 2d 611), *cert. denied*, 533 U.S. 916, 121 S. Ct. 2521, 150 L. Ed. 2d 693 (2001).

The federal courts have also applied *Noerr-Pennington* immunity to pre-litigation activities, including demand letters. *See, e.g., McGuire Oil Co. v. Mapco, Inc.*, 958 F.2d 1552, 1560 (11th Cir. 1992) (prelitigation demand letters immunized by *Noerr-Pennington* doctrine); *Coastal States Mktg., Inc. v. Hunt*, 694 F.2d 1358, 1367-68 (5th Cir. 1983) (same). Demand or prelitigation immunity derives from the immunity extended to good-faith litigation because the

8

conduct incident and prior to the filing of a lawsuit is seen as "part and parcel" of such litigation. *See id.* In fact, the courts have even immunized prelitigation conduct that went beyond demand letters. *See Primetime 24 Joint Venture v. Nat'l Broadcasting Co., Inc.*, 219 F.3d 92, 99-100 (2nd Cir. 2000) (broadcast networks' repeated challenges to signal strength determinations by satellite programming provider to protect copyrights, even though "more immediately harmful to a competitor" than prelitigation threat letters, held protected under *Noerr-Pennington* doctrine where challenges not sham); *Matsushita Elec. Corp. v. Loral Corp.*, 974 F. Supp. 345, 359 (S.D.N.Y. 1997) (letters encouraging settlement relating to litigation, even where sent to non-party companies, held immunized by *Noerr-Pennington* doctrine).

### 2. DIRECTV's Complaint and Demand Letters Are Immunized by the *Noerr-Pennington* Doctrine.

DIRECTV is immunized from liability for filing its complaint against Mr. Davidson under the First Amendment and the *Noerr-Pennington* doctrine. Regardless of the purpose of the lawsuit, the only limit to this immunity is if the lawsuit were objectively baseless, and thus a "sham." *See PREI*, 508 U.S. at 51, 113 S. Ct. at 1923, 123 L. Ed. 2d at 618. A lawsuit is objectively baseless only if "no reasonable litigant could realistically expect success on the merits." *See id.* If an objective party can conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under the *Noerr-Pennington* doctrine. *See Baltimore Scrap Corp.*, 237 F.3d at 399. Mr. Davidson has not alleged that DIRECTV's complaint is a sham, and as such, his counterclaim is barred.

The counterclaim is also barred as to DIRECTV's demand letters. Those letters are precisely the kind of prelitigation conduct protected by the *Noerr-Pennington* doctrine. The letters alert their recipients, including Mr. Davidson, of DIRECTV's intent to protect its programming from theft through litigation if necessary. The demand letters utilized by

9

DIRECTV inform the individual (including Mr. Davidson in this case) that in purchasing and possessing the illegal signal theft equipment, he had violated federal statutes, and that DIRECTV was entitled to statutory damages and other relief should the company succeed in litigation. The letter further informs the individual that DIRECTV had been damaged by other users of signal theft equipment and would pursue legal action against those engaged in signal theft. This communication prior to commencing litigation is protected speech under *Noerr-Pennington*. *See Coastal States Marketing*, 694 F.2d at 1367 ("The litigator should not be protected only when he strikes without warning. If litigation is in good faith, a token of that sincerity is a warning that it will be commenced and a possible effort to compromise the dispute.").

Moreover, the communication -- directed solely to Mr. Davidson, and for the purpose of protecting the property rights of DIRECTV short of but in anticipation of good-faith litigation -- did not go as far as other prelitigation actions that have been given immunity under *Noerr-Pennington*. *See, e.g., Primetime 24 Joint Venture*, 219 F.3d at 99-100; *Barq's Inc. v. Barq's Beverages, Inc.*, 677 F. Supp. 449, 453 (E.D. La. 1987) (letters to competitors and suppliers that threatened litigation, and attending publicity, were "part and parcel of the petitioning immunity of *Noerr-Pennington* if the litigation itself was in good faith").

Additionally, as noted above, Mr. Davidson has made no allegation that DIRECTV's lawsuit fails the *PREI* "objectively baseless" test. There is no contention in Mr. Davidson's counterclaims that the demands or allegations raised by DIRECTV, in the letters or the subsequent complaint, are without merit, or that no reasonable litigant could realistically expect success on the merits. Mr. Davidson's own contentions, thus, confirm that DIRECTV's demand letters fall within the ambit of protected conduct under *Noerr-Pennington*, and cannot provide the basis for Mr. Davidson's counterclaim as a matter of law. *See Coastal States Marketing*, 694

10

F.2d at 1367-68 (because defendants' use of litigation did not fall within sham exception to *Noerr-Pennington* immunity, prelitigation demand letters were also protected). Because DIRECTV's conduct is immunized, Mr. Davidson's counterclaim is barred as a matter of law.

## III.   CONCLUSION

For the foregoing reasons, DIRECTV respectfully requests that this Court grant its motion to dismiss the counterclaim of Defendant Bernard Davidson.

RESPECTFULLY SUBMITTED this 3rd day of April, 2003.

ELLIS & WINTERS LLP

Leslie C. O'Toole
State Bar No. 13640
Brian J. Schoolman
State Bar No. 26266
P.O. Box 33550
Raleigh, NC 27636
Telephone:(919) 865-7000
Facsimile: (919) 865-7010

11

## CERTIFICATE OF SERVICE

I. Brian J. Schoolman, do certify that I have served a true and correct copy of the attached memorandum by depositing a copy thereof in the United States mail, postage prepaid, first class, addressed to the defendant as follows:

Andrew J. Wingo, Esq.
330 South Main Street
Mooresville, NC 28115
*Attorney for Bernard Davidson*

This the 3rd day of April, 2003.

Brian J. Schoolman

RECEIVED
STATESVILLE, NC
APR 7 2003
Clerk, U. S. Dist. Court
W. Dist of N. C.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

FILED
3-18-0 3br
DAVID W. DANIEL, CLERK
US DISTRICT COURT, EDNC

No. 5:02-CV-679-BR3

| | | |
|---|---|---|
| DIRECTV, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | O R D E R |
| | ) | |
| RUSSELL BREEDLOVE, KAREN A. | ) | |
| HORWATH, GEORGE HALLOW, ROBERT J. | ) | |
| HOYLE, AND CHRISTOPHER M. KEENER, | ) | |
| | ) | |
| Defendants. | ) | |

DIRECTV, INC.'s (DIRECTV) motion to dismiss is before the court.

Plaintiff DIRECTV filed a complaint on 23 September 2002 alleging violations of the

Cable Communications Policy Act, 47 U.S.C. § 605(e)(3)(C), 18 U.S.C. § 2511 (regarding illegal

interception of electronic communications), 18 U.S.C. § 2512 (regarding illegal possession,

manufacture, distribution, or advertising of electronic, mechanical or other devices or

equipment), 47 U.S.C. § 605(e)(4) (regarding willful assembly or modification of devices or

equipment), N.C. Gen. Stat. § 14-113.5 (regarding theft of telecommunication services), N.C.

Gen. Stat. § 15A-287 (regarding interception and disclosure of electronic communications), N.C.

Gen. Stat. § 75-1.1 (regarding unfair and deceptive trade practices), and civil conversion.

DIRECTV seeks injunctive, declaratory and monetary relief.

DIRECTV has filed notices of voluntary dismissal of its claims against three of the five

defendants: Russell Breedlove (6 November 2002); George Hallow (12 November 2002); and

Robert J. Hoyle (11 December 2002). The notice of dismissal pertaining to Hoyle was followed on 27 December 2002 with a stipulation of dismissal as to Hoyle with prejudice. Finally, on 9 January 2002, this court entered an order allowing a motion by DIRECTV to dismiss its claims against defendant Christopher Keener with prejudice.

In the interim, defendant Karen Horwath (Horwath) filed an answer and a counterclaim on 15 November 2002, alleging violations of the North Carolina Debt Collection Act (NCDCA), N.C. Gen. Stat. §§ 75-50 *et seq.*, and North Carolina's Unfair and Deceptive Trade Practices Act (UDTPA), N.C. Gen. Stat. § 75-1.1. On 4 December 2002, DIRECTV filed this motion to dismiss Horwath's counterclaim with a supporting memorandum. Horwath filed a response on 26 December 2002. DIRECTV has not filed a reply brief. The motion is ripe for review.

## I. Facts

DIRECTV is a California-based company in the business of distributing satellite television broadcasts throughout the United States. (Compl. ¶ 2.) As described by plaintiff, the programming is scrambled by DIRECTV and is transmitted to subscribers from satellites orbiting the earth. (Compl. ¶¶ 2, 3.) Once broadcast, the subscribers receive the signals through satellite dishes, which are attached to receivers designed to unscramble the signals for those programs paid for by subscribers. (Compl. ¶ 3; Pl.'s Mem. at 1.)

It is possible to purchase illegal equipment to modify or circumvent DIRECTV's signal-scrambling technology. (Compl. ¶ 5.) As a result of an enforcement action brought by federal and state authorities against one of the companies that manufactures such equipment, White Viper Technologies (White Viper), plaintiff was able to gain access to sales records listing sales of illegal equipment to certain individuals, including some DIRECTV subscribers. (Compl. ¶¶ 5,

2

7.) According to White Viper's sales records, Horwath, a Durham resident, purchased illegal equipment designed for the theft of DIRECTV's satellite programming. (Compl. ¶ 17.)

Horwath received a demand letter from the "DIRECTV End User Development Organization" dated 7 August 2002. The letter alleged that Horwath had purchased, used, or attempted to use the White Viper equipment at issue. According to Horwath, the letter implied that Horwath's mere possession of such equipment allowed DIRECTV a civil remedy. (Def.'s Br. at 2.) The letter also informed Horwath that DIRECTV was contemplating litigation and that the company would be willing to settle the matter if Horwath surrendered the signal theft devices in her possession, promised in writing not to obtain any other such equipment, and paid a monetary sum. On 8 August 2002, Horwath wrote a letter to DIRECTV stating that she did not own illegal signal theft equipment and that it had not been purchased by her or by her husband. On 20 August 2002, Dale Herring, an investigator for DIRECTV, called Horwath, and she reiterated her position.

On 23 September 2002, DIRECTV filed this action in federal court against several defendants, including Horwath, alleging violations of various federal and state laws regarding the purchase, possession and use of illegal equipment designed for the purpose of stealing DIRCETV's satellite programming. Horwath responded by filing a counterclaim alleging that the demand letter sent to her by DIRECTV violated the NCDCA and the UDTPA. Specifically, Horwath maintains that the letter illegally accused her of "using" or "attempting to use" signal theft equipment without sufficient evidence that she had done so, that the letter unfairly accused her of engaging in illegal conduct and urged her to "acknowledge her illegal conduct," and that the letter gave the impression that it carried the weight of law enforcement. (Def.'s Br. at 3-4.)

3

The claims against Horwath and Horwath's counterclaims are the only claims remaining in this lawsuit.

## II. Motion to Dismiss Standard

For purposes of a motion to dismiss pursuant to Rule 12(b)(6), the court construes the complaint in the light most favorable to the non-moving party and takes as true the allegations therein. As stated by the Supreme Court:

> In appraising the sufficiency of the complaint we follow, of course, the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.

Conley v. Gibson, 355 U.S. 41, 45-46 (1957). "[T]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claim." Revene v. Charles County Com'rs, 882 F.2d 870, 872 (4th Cir. 1989). The same standard applies to motions to dismiss counterclaims under Rule 12(b)(6). See.e.g., Coliseum Cartage Co., Inc. v. Carlen Distr. Sys., Inc., 732 F. Supp. 1340, 1342 (M.D.N.C. 1989).

## III. Unfair Debt Collection

DIRECTV argues that Horwath's counterclaim for unfair debt collection in violation of the NCDCA fails to state a claim upon which relief can be granted for two reasons: 1) the letter sent by DIRECTV to Horwath sought recovery for damages incurred as a result of the alleged theft of programming by Horwath and does not constitute a "debt" within the meaning of the NCDCA; and 2) the counterclaim is barred by the Noerr-Pennington doctrine, which immunizes acts related to petitioning the government, including the courts, for redress. (Pl.'s Br. at 3.) Because the court concludes that Horwath's alleged theft of DIRECTV's services is not a "debt" within the meaning of the NCDPA, the court will not address the Noerr-Pennington issue.

4

The NCDCA prohibits unfair, deceptive, or fraudulent practices in the collection of debts. In order to state a claim for unfair debt collection, a plaintiff must make the following threshold showings: the obligation owed must be a debt; the one owing the obligation must be a consumer; and the one trying to collect the debt must be a debt collector. See Reid v. Ayers, 531 S.E.2d 231, 233 (N.C. Ct. App. 2000) (citing N.C. Gen. Stat. § 75-50(1)-(3)).

The North Carolina legislature has defined a "debt" as "any obligation owed or due or alleged to be owed or due from a consumer." N.C. Gen. Stat. § 75-50(2). See Reid, 531 S.E.2d at 234 (holding that homeowners' association dues and assessments satisfy the definition of debt). North Carolina courts have not addressed the issue before the court today: whether an attempt to obtain redress for alleged violations of applicable federal and state laws, in this case theft of satellite cable services, can be considered an attempt to collect a debt under the NCDCA. North Carolina courts, in construing the NCDCA, have found cases construing the parallel federal act instructive though not binding. See Reid, 531 S.E.2d at 234. Under the federal Fair Debt Collection Practices Act (FDCPA), "debt" is defined as "any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment." 15 U.S.C. § 1692a(5) (1998).

Construing the FDCPA, several courts have held that a "claim arising out of an alleged theft does not constitute a 'debt' . . . ." Coretti v. Lefkowitz, 965 F. Supp. 3, 5 (D. Conn. 1997). See also Shorts v. Palmer, 155 F.R.D. 172 (S.D. Ohio 1994) (where Rite Aid attempted to recover damages for individual's theft of two boxes of cigars, the court held that an individual

5

was not a consumer vis-a-vis the cigars and that the alleged theft did not constitute a debt under the FDCPA). "[A]lthough a thief undoubtedly has an obligation to pay for the goods or services he steals, the FDCPA limits its reach to those obligations to pay arising from consensual transactions, where parties negotiate or contract for consumer-related goods or services." Coretti, 965 F. Supp. at 5 (citing Bass v. Stolper, Koritzinsky, Brewster & Neider, S.C., 111 F.3d 1322, 1326 (7th Cir. 1997)[1]). Specifically, the Coretti court held that the plaintiff's unauthorized reception of Cablevision's Pay Per View and Premium Programming constituted theft and not a receipt of services giving rise to a "debt." 965 F. Supp. at 5. See also Hawthorne v. MacAdjustment, Inc., 140 F.3d 1367, 1372 (11th Cir. 1998)("Obviously, theft is neither consensual nor contractual; nor does it constitute a business dealing. Consequently, it fails to meet the definition of a "transaction" under the FDCPA."); Zimmerman v. HBO Affiliate Group, 834 F.2d 1163 (3rd Cir. 1987)(payment obligation arising from theft of television signals was outside the reach of the FDCPA because there was no transaction). Likewise, Horwath's alleged illegal receipt of DIRECTV's services would constitute theft and not usage giving rise to debt.[2]

The court acknowledges that the Coretti and Zimmerman courts relied on the language of the federal statute defining "debt" as an obligation to pay money "arising out of a transaction" and that the North Carolina statute does not contain that same language in its definition of debt.

---

[1] The Bass court held that, although the FDCPA defined debt broadly, not all obligations to pay are considered debts under that Act. 111 F.3d at 1324. As an illustration, the Bass court specifically noted that some conduct, such as theft, did not amount to a transaction that could give rise to a debt under the statute. Id. at 1326 (citing Zimmerman v. HBO Affiliate Group, 834 F.2d 1163, 1168 (3rd Cir. 1987)(noting that nothing in the legislative history of the FDCPA "leads us to believe that Congress intended to equate asserted tort liability with asserted consumer debt").)

[2] Indeed, in the letter from DIRECTV to Horwath, DIRECTV sought, not reimbursement for the value of the services actually used by Horwath, but rather, surrender of all illegal equipment, a written statement setting forth an intent to forbear usage of illegal equipment in the future, and a "monetary sum to DIRECTV for your past wrongful conduct and the damages thereby incurred by the company." (Def.'s Br., Ex. 1 at 2.)

6

The court further acknowledges that the NCDCA says a debt is "*any* obligation owed or due or alleged to be owed or due from a consumer." N.C. Gen. Stat. § 75-50(2) (emphasis added). The court finds, however, that North Carolina's statutory definition of the terms "debt" and "consumer," the North Carolina courts' limited treatment of those terms, and the reasoning offered by analogous federal cases dealing with alleged theft provide persuasive support for the conclusion that North Carolina's definition of "debt" is not broad enough to encompass damages sought as a result of tortious or criminal conduct.

North Carolina's statutory definition of debt, while broadly including "any obligation" is nevertheless limited by the qualification that the debt must be "owed by or due from a consumer." North Carolina defines the term "consumer" as "any natural person who has incurred debt or alleged debt for personal, family, household or agricultural purposes." N.C. Gen. Stat. § 75-50(1).[3] While the rather circular relationship between these terms does not particularly serve to elucidate the meaning of either, the use of the term "consumer" in the context of the definition of "debt" necessarily implies the transactional nature of the interaction contemplated by the statute. In other words, a person who steals or attempts to steal something typically would not be described as one incurring debt for a particular purpose. See Shorts, 155 F.R.D. at 174 (individual who attempted to steal cigars from Rite Aid not a "consumer" with respect to alleged theft within meaning of FDCPA). An alleged thief is simply not a consumer, and damages for allegedly illegal conduct cannot be considered debt within the meaning of the statute.

---

[3] The FDCPA defines "consumer" as "any natural person obligated or allegedly obligated to pay any debt." 15 U.S.C. § 1692a(3). Perhaps unavoidably, the definitions of "debt" and "consumer" in both the North Carolina act and the FDCPA are interdependent.

7

In this case, as it happens, Horwath was a consumer in one sense because she was a customer of DIRECTV, but again, with respect to the services at issue in this case, she was not a "consumer" or paying cutomer, but rather an alleged thief. See Coretti, 965 F. Supp. at 5 (although Cablevision had extended to plaintiff the right to defer payment with respect to its *basic* cable services, it did not extend any such right with respect to the Pay Per View or Premium Programming Services, which plaintiff had allegedly stolen by using an illegal decoding device).

Looking for guidance to federal cases construing the FDCPA, the court notes that "cases holding that a 'debt' exists under the FDCPA have consistently involved some form of initial 'business dealing' creating the obligation to pay." Reibe v. Juergensmeyer and Associates, 979 F. Supp. 1218, 1220-21 (N.D. Ill. 1997)(holding that the borrowing of a library book is not the type of conduct the FDCPA considers a transaction and that the ensuing obligation to pay for failure to return the book does not create a "debt" under the FDCPA). The Coretti, Zimmerman, and Shorts courts all understood the FDCPA in the same way, and this understanding supported their conclusions that theft did not give rise to debt under the Act.

Very few North Carolina courts have interpreted the NCDCA. In Reid, in which the court held that homeowners' association dues were debt within the NCDCA, the court explicitly acknowledged cases construing the federal statute "to be particularly instructive." Noting that a majority of state and federal courts to consider the issue had concluded that homeowners' association dues, assessments, and rent are properly classified as "debt," the Reid court joined those courts in rejecting the Zimmerman court's conclusion that to be a debt, "there must be an actual extension of credit plus a deferred payment obligation, i.e., a 'transaction in which a

8

consumer is offered or extended the right to acquire' money or property." 531 S.E.2d at 233.[4]
The Reid court noted its acceptance of the Seventh Circuit's reasoning that

> [b]ecause the statute's definition of "debt" focuses on the transaction creating the
> obligation to pay, it would seem to make little difference under that definition that
> unit owners generally are required to pay their assessments first, before any goods
> are provided by the association.

Id. at 234 (citing Newman v. Boehm, Pearlstein & Bright, Ltd., 119 F.3d 477, 481 (7th Cir.
1997)). Accordingly, the Reid court implicitly accepted the transactional premise of the concept
of debt, recognizing as debt, for purposes of that case, an obligation arising from the consensual,
contractual relationship between homeowners' associations and their members.[5] The Reid
court's decision, therefore, does not suggest that an obligation constituting a debt under the North
Carolina statute can arise from anything other than a consensual transaction. The limited
guidance offered by the other North Carolina courts that have interpreted the NCDCA simply
does not suggest that those courts would construe the NCDCA broadly enough to include
attempts to recover damages for or settle claims regarding instances of alleged theft.

---

[4] It is also worthy of note that the Third Circuit has since acknowledged the emerging majority view that the
FDCPA applies to all obligations to pay money which arise out of consensual consumer transactions, but has also
reaffirmed its holding in Zimmerman regarding the issue of theft as debt and emphasized the fact that the "offer or
extension of credit" language was unnecessary to its decision in that case: "Clearly, there was no 'debt' in
Zimmerman because the obligations arose out of theft rather than a 'transaction.' This was our holding and we
certainly adhere to it. The further statement that a transaction must involve the 'offer or extension of credit' in order
to be covered by the FDCPA was not necessary to the decision." Pollice v. National Tax Funding, L.P., 225 F.3d
379, 401 n.24 (3rd Cir. 2000).

[5] It should be noted that, although it includes language referring to the fact that a debt must arise from a
certain type of transaction, the federal statute does not define the term "transaction." Nevertheless, courts have
consistently excluded alleged theft from the transactions contemplated by the statute.
    Moreover, the court rejects Horwath's suggestion that she purchased equipment from White Viper for
personal purposes and thus engaged in a transaction within the meaning of the federal statute. (Def.'s Br. at 6.)
Under the federal statute, and the state statute by analogy, it is the transaction giving rise to the alleged debt that is
relevant. Plaintiff's interaction with White Viper is not pertinent to the resolution of this case.

9

This court finds the reasoning of the foregoing opinions persuasive and concludes, likewise, that DIRECTV's letter to and ensuing lawsuit against Horwath were not attempts to collect a "debt" within the meaning of the NCDCA. Accordingly, Horwath's counterclaim alleging a violation of the NCDCA will be dismissed.

## IV. Unfair and Deceptive Trade Practices

North Carolina General Statute § 75-1.1 prohibits unfair and deceptive trade practices. The only unfair and deceptive trade practices recognized in the area of debt collection are those practices described in the NCDCA. See N.C. Gen. Stat. § 75-56 (the "specific and general provisions of this Article shall exclusively constitute the unfair or deceptive acts proscribed by G.S. § 75-1.1 in the area of commerce regulated by" the Debt Collection Act). See Talbert v. Mauney, 343 S.E.2d 5, 8 (N.C. Ct. App. 1986). Because Horwath's claim under the NCDCA fails as a matter of law, her unfair and deceptive trade practices claim must also fail.

## V. Conclusion

For the foregoing reasons, plaintiff's motion to dismiss defendant Horwath's counterclaims alleging violations of the NCDCA and the UDTPA is ALLOWED, and those claims are DISMISSED.

This ___16___ March 2003.

W. EARL BRITT
Senior United States District Judge

di/rb/jcd

10

RECEIVED
STATESVILLE, NC
APR 7 2003
Clerk, U. S. Dist. Court
W. Dist of N. C.

RECEIVED APR 0 3 2003

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:02-CV-741-BO(3)

FILED
4-2-03 JS
DAVID W. DANIEL CLERK
US DISTRICT COURT EDNC

|  |  |  |
|---|---|---|
| DIRECTV, INC., | ) | |
| Plaintiff, | ) | |
| v. | ) | O R D E R |
| MICHAEL CALLAHAN, MESHALLE | ) | |
| CARTER, LEE HAMILTON, and, | ) | |
| GERALD WILLIAMS, | ) | |
| Defendants. | ) | |
|  | ) | |

This matter is before the Court on Plaintiff's motion to dismiss claims against Defendant
Hamilton and Plaintiff's motion to dismiss Defendant Callahan's counterclaims. After
consideration of the parties' arguments, this Court GRANTS Plaintiff's motions.

BACKGROUND

Plaintiff DIRECTV, Inc. (DIRECTV) is a California-based company which distributes
satellite television broadcasts throughout the United States. To prevent its services from being
stolen, Plaintiff executed writs of seizure, with the assistance of local law enforcement, at a
shipping facility used by several companies which sell equipment designed to steal DIRECTV's
programming. Sales records obtained in the seizure indicated that Defendant Michael Callahan
purchased such equipment.

On July 24, 2002, Callahan received from Plaintiff a "demand letter" in which Plaintiff
made a settlement offer to him. In the letter, Plaintiff explained that it had obtained business
records showing Callahan "purchased illegal signal theft equipment to gain unauthorized access

1

to DIRECTV's programming." Plaintiff notified Callahan that his "purchase and use, or attempted use, of illegal signal theft equipment to access DIRECTV's programming violates federal and state laws." Finally, Plaintiff explained it was considering legal action against Callahan and offered to settle the claims if he surrendered the illegal equipment, signed a statement indicating that he would not engage in such activity in the future, and paid a monetary sum for damages. In response to the letter, Callahan telephoned a DIRECTV investigator and stated that he had not purchased any equipment that was illegal or intended to be used for illegal purposes. The investigator replied that if Callahan did not pay $3,500, Plaintiff would purse the matter in court.

On October 10, 2002, Plaintiff filed the underlying complaint against Defendants Michael Callahan, Lee Hamilton, and other individuals, alleging violations of federal and state law with respect to the purchase, possession, and use of illegal equipment designed for the purpose of stealing DIRECTV's programming. Since the complaint was filed, Plaintiff has settled its claims with Hamilton, and Plaintiff now moves for voluntary dismissal of claims against him, pursuant to Federal Rule of Civil Procedure 41(a)(2).

Defendant Callahan has answered Plaintiff's complaint and has made two counterclaims, alleging violations of the North Carolina Debt Collection Act, N.C. Gen. Stat. §§ 75-50 to 56, and the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat § 75-1.1. Plaintiff moves to dismiss these counterclaims, pursuant to Federal Rule of Civil Procedure 12(b)(6).

2

## ANALYSIS

### Motion to Dismiss Complaint Against Defendant Hamilton

Under Federal Rule of Civil Procedure 41(a)(2), an action may be dismissed at the plaintiff's instance "upon such terms and conditions as the court deems proper." Plaintiff's motion to dismiss Defendant Hamilton is unopposed and dismissal would not result in prejudice to any party. Accordingly, Plaintiff's motion to dismiss is GRANTED and all claims against Defendant Hamilton are DISMISSED.

### Motion to Dismiss Defendant Callahan's Counterclaims

This Court has jurisdiction of Callahan's counterclaims for violations of the North Carolina Debt Collection Act, N.C. Gen. Stat. §§ 75-50 to 56, and the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat § 75-1.1., based on supplemental jurisdiction, pursuant to 28 U.S.C. §1367. As a federal court deciding a matter of state law, the Erie doctrine obliges this Court to apply the jurisprudence of North Carolina's highest court, the North Carolina Supreme Court. *See Private Mortgage Inv. Serv., Inc. v. Hotel and Club Assoc. Inc.*, 296 F.3d 308, 312 (4th Cir. 2002); *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726; (citing *Erie R. Co. v. Tompkins*, 116 U.S. 2211 (1938)). If there is no decision by that court which is directly on point, then this Court must predict how the North Carolina Supreme Court would rule if presented with the issue. *See Private Mortgage*, 296 F.3d at 312. Decisions by that State's intermediate appellate court "constitute the next best indicia of what state law is." *Id.* (internal citation omitted).

### Unfair Debt Collection

In the present case, this Court is called on to construe the North Carolina Debt Collection

3

Act (NCDCA). N.C. Gen. Stat §§ 75-50 to 56. The question before this Court is whether the NCDCA extends to cover conduct by a tort victim making a settlement offer to the alleged tort feasor. To make a claim under the Act, "[f]irst, the obligation owed must be a 'debt'; second, the one owing the obligation must be a 'consumer'; and third, the one trying to collect the obligation must be a 'debt collector.'" *Reid v. Ayers*, 531 S.E.2d 231, 233 (N.C. App. 2000).

The statutory definition of *debt* is unhelpful, merely defining a debt as "any obligation owed or due or alleged to be owed or due from a consumer," N.C. Gen. Stat. § 75-50(2). North Carolina's supreme court and appellate courts have not addressed the issue of whether claimed tort damages constitute a debt under the NCDCA. In one of the few North Carolina cases construing the meaning of debt under the act, the court of appeals found that the term included homeowners' association dues and assessments. *See id.* The court noted that, in determining the meaning of debt under the statute, it found "cases construing the parallel federal statute [the Fair Debt Collection Practices Act (FDCPA)] to be particularly instructive." *Id.* In particular, it cited a Seventh Circuit opinion emphasizing that a debt must arise from a transaction. *See Newman v. Boehm, Pearlstein & Bright, Ltd.*, 119 F.3d 477, 481 (7th Cir. 1997). Similarly, the Eleventh Circuit has found that, under the FDCPA, claimed tort damages are not a debt because the damages do not arise from some kind of business dealing or other consensual obligation constituting a transaction. *See Hawthorne v. Mac Adjustment, Inc.*, 140 F.3d 1367 (11th Cir. 1998).

This Court finds that to constitute a debt under the NCDCA, the obligation must arise from some kind of business dealing or other consensual obligation. Because the tort damages alleged by DIRECTV did not arise from a such a transaction, they are not a debt. Accordingly,

4

Defendant Callahan has failed to meet the threshold requirements for a claim under the NCDCA, and his counterclaim is DISMISSED.

## Unfair and Deceptive Trade Practices

Defendant Callahan has also made a counterclaim for Unfair and Deceptive Trade Practices (UDTP). N.C. Gen. Stat. § 75-1.1. Callahan alleges that DIRECTV's demand letter "created a false impression about the demand letter's source because the letter appeared to be one approved by a government official." Answer and Counterclaim, ¶ 20.

However, Callahan fails to allege facts sufficient to establish a claims for UDTP. The demand letter does not create a false impression about the letter's source.[1] The letter is written on clearly designated DIRECTV letterhead, indicating "DIRECTV" at the top of the page and "A Hughes Company" at the bottom. It is signed by DIRECTV's investigator, David Bautista, followed by the phone number Callahan used to contact him at his DIRECTV office. Moreover, the letter's closest reference to a government official is its statement that "should [Callahan] choose to reject DIRECTV's settlement offer. . . pleased be advised that DIRECTV will initiate legal proceedings in the Federal District Court seeking the award of damages and other relief discussed above." Merely indicating the forum in which one would pursue legal action does not amount to the creation of the false impression that the letter was approved by a government official. Accordingly, Defendant Callahan's counterclaim must be DISMISSED.

## CONCLUSION

---

[1]The letter is attached to Callahan's response to Plaintiff's motion to dismiss counterclaims. A court may consider a document attached to the motion to dismiss when it is integral to the claim, explicitly relied on in the pleadings, and the authenticity of the document is not challenged. *See Phillips v. LCI Intern., Inc.*, 190 F.3d 609, 618 (4th Cir. 1999).

For the reasons stated above, this Court GRANTS Plaintiff's motion to dismiss claims against Defendant Hamilton and GRANTS Plaintiffs motion to dismiss Defendant Callahan's counterclaims.   Plaintiff's claims against Defendant Hamilton are hereby DISMISSED. Defendant Callahan's counterclaims are hereby DISMISSED.


SO ORDERED.

This 29 day of March, 2003.

TERRENCE W. BOYLE
CHIEF UNITED STATES DISTRICT JUDGE

... ... foregoing to be a true and correct
copy of the original.
David W. Daniel, Clerk
United States District Court
Eastern District of North Carolina

Deputy Clerk